IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In Re:

GRAND CENTRAL BUILDING, LLC,

               Debtor.

Bankruptcy Case No. 1:10-bk-00638
(Chapter 11)

## RESPONSE OF THE HOME SAVINGS AND LOAN COMPANY OF YOUNGSTOWN, OHIO TO TRUSTEE'S MOTION TO REINSTATE THE AUTOMATIC STAY

Comes now The Home Savings and Loan Company of Youngstown, Ohio ("Home Savings and Loan"), secured creditor, by Donald J. Epperly, its attorney, pursuant to 11 U.S.C. §§ 105 and 362(d), and hereby responds to the Motion of Robert L. Johns, Chapter 11 Trustee (the "Trustee") for the bankruptcy estate of Grand Central Building, LLC (the "Grand Central") to Re-Instate the Automatic Stay Against Home Savings and Loan, as previously filed herein, and in support thereof, shows:

1.     On or about December 15, 2003, Grand Central executed and delivered to Home Savings and Loan a Deed of Trust Note (the "Note"), pursuant to the terms of which it borrowed the principal sum of Two Million Six Hundred Forty Three Thousand Seven Hundred Fifty and 00/100 Dollars ($2,643,750.00) from Home Savings and Loan (the "Indebtedness") and agreed to repay said indebtedness in accordance with the terms set forth in said Note;

2.     To secure payment of the Note, Grand Central executed and delivered to Home Savings and Loan a Commercial Deed of Trust and Security Agreement (the "Deed of Trust"),

5443920

dated December 15, 2003, and recorded in the Office of the Clerk of the County Commission of Monongalia County, West Virginia in Trust Deed Book No. 1265, at page 360, wherein the Debtor granted and conveyed unto Jonathon Nicol, in trust, those certain tracts or parcels of land situate in the Fourth Ward of the City of Morgantown, Monongalia County, West Virginia, together with all improvements thereon and appurtenances thereunto attached, being commonly known as the Grand Central Business Center, (the "Real Estate") to secure repayment of said Indebtedness;

3.      The December 15, 2003 Deed of Trust is a validly perfected and first priority lien in and to the Real Estate;

4.      As more particularly set forth on that certain Summary Appraisal dated March 8, 2010 and prepared by Samuel D. Koon & Associates, a copy of which is attached hereto and made a part hereof as "Exhibit A", the Real Estate has an "as is" market value of Two Million Four Hundred Fifty Thousand and 00/100 Dollars ($2,450,000.00);

5.      Pursuant to the terms of the Note, Grand Central was required to make sixty (60) consecutive monthly payments of principal and interest in the amount of Seventeen Thousand Four Hundred Forty and 01/100 ($17,440.01), each, beginning on January 15, 2004 and continuing on the 15th day of each month thereafter, through and including December 15, 2008. Thereafter, Grand Central was required to make fifty-nine (59) consecutive monthly payments of principal and interest in an amount sufficient to amortize the remaining principal balance then due over a period of twenty (20) years at a variable interest rate equal to 2.75% in excess of the weekly average yield on United States treasury securities, adjusted to a constant maturity of five (5) years, beginning on January 15, 2009 and continuing on the 15th day of each month

thereafter, through and including November 15, 2013, with a final payment of all remaining principal, accrued and unpaid interest and fees due on December 15, 2013.

6.      Grand Central defaulted in payment of sums due under the provisions of the Note, as subsequently modified in forbearance, and as of August 2, 2010 was indebted to Home Savings and Loan in the aggregate amount of Two Million Four Hundred Ninety Two Thousand Three Hundred Eighty Nine and 82/100 Dollars ($2,492,389.82), consisting of principal in the amount of Two Million Three Hundred Thirty Three Thousand Eighty Seven and 88/100 Dollars ($2,333,087.88), together with accrued interest in the amount of One Hundred Forty Thousand Five Hundred Fifty Two and 34/100 Dollars ($140,552.34), and late fees and other charges in the amount of Eighteen Thousand Seven Hundred Forty Nine and 60/100 Dollars ($18,749.60). Interest continues to accrue at the rate of $405.04998 per diem.  As a result of Grand Central's defaults under the provisions of the Note, Home Savings and Loan proceeded with foreclosure preparations relative to the Real Estate, with a sale having been set pursuant to the terms of the Deed of Trust for March 26, 2010.

7.      On March 25, 2010 (the "Petition Date"), Grand Central filed a petition for relief under Chapter 11 of the Bankruptcy Code with this Court;

8.      On April 7, 2010 Home Savings and Loan filed its Motion for Relief From Stay with this Court;

9.      On April 29, 2010 this Court entered that certain "Temporary Stipulation and Order With Respect to Motions for Relief From The Automatic Stay and To Prohibit Use of Cash Collateral" as agreed to by Grand Central and Home Savings and Loan (the "Order");

10.     As entered, the Order required the Debtor to make regular monthly payments to Home Savings and Loan in the amount of $12,000.00 each, beginning on April 25, 2010 and

continuing on the 25th day of each month thereafter, in order to adequately protect Home Savings and Loan's interests in the Real Estate. The aforesaid payments, which represented a partial payment of the interest accrued each month pursuant to the terms of the Note, were to be made directly to Donald J. Epperly, as counsel for Home Savings and Loan, at the following address: Steptoe & Johnson PLLC, P.O. Box 2190, Clarksburg, West Virginia 26302-2190;

11. Pursuant to the terms of the Order, in the event Grand Central failed to timely make any payment called for therein, such payment would be considered to be in default. Upon such default, Home Savings and Loan was to give written notice of said default (the "Default Notice") to the Debtor, which Default Notice would afford the Debtor at least five (5) calendar days, including weekends and holidays (the "Cure Period"), from the date of the mailing of the Default Notice, within which the Debtor might cure the default. A copy of such Default Notice was to also be filed with the Clerk of this Court. Thereafter, the Default could only be cured by payment in cash or certified funds on or before expiration of the Cure Period;

12. The Order further contemplated that if the default described in any Default Notice was not cured by payment in cash or certified funds on or before the expiration of the Cure Period, then upon Home Savings and Loan's filing of an Affidavit with this Court stating the Debtor's failure to cure said default, Home Savings and Loan would be deemed to be inadequately protected pursuant to Section 362 of the United States Bankruptcy Code and such uncured default would constitute cause under Section 362(d)(1) of the United States Bankruptcy Code for the modification of the automatic stay provided by Section 362(a) of the Bankruptcy Code and the automatic stay would thereafter would be lifted without further application to or action by the Court insofar, and insofar only, so as to allow Home Savings and Loan to dispose

of and liquidate its interest in the Real Estate in accordance with the terms of the loan documents and applicable non-bankruptcy law;

13.     As a result of Grand Central's failure to make the adequate protection payment required by the Order to be made on May 25, 2010, counsel for Home Savings and Loan caused a Notice of Default to be mailed to the Debtor and its counsel on or about June 10, 2010, with a copy thereof being filed with this Court;

14.     On June 14, 2010, Grand Central tendered to counsel for Home Savings and Loan a check in the amount of $12,000 in an apparent attempt to cure the aforementioned default;

15.     Thereafter, Home Savings and Loan advised its counsel that the check tendered by the Debtor could not be negotiated because the account upon which it had been drawn had apparently been closed;

16.     On July 6, 2010, counsel for Home Savings and Loan contacted John P. Lacher, Debtor's counsel, by telephone to alert him to the fact that the May 25, 2010 payment remained in default, and that the payment due on June 25, 2010 had also not been made, both in derogation of the terms of the Order;

17.     On July 9, 2010 counsel for Home Savings and Loan caused to be filed with the Court his affidavit which established: (i) that no payments had been made by or on behalf of the Debtor to cure the aforesaid default; and (ii) that the Cure Period contemplated by the Order had expired relative to the required May 25, 2010 payment, and further set forth that, pursuant to the express terms of the Order, the failure of Grand Central to timely cure the default constituted cause under Section 362(d)(1) of the United States Bankruptcy Code for the modification of the automatic stay provided by Section 362(a) of the Bankruptcy Code;

18.     Upon filing of the affidavit as aforesaid, Home Savings and Loan viewed the automatic stay provided by Section 362(a) of the Bankruptcy Code as having been lifted, pursuant to the express terms of the Order, and proceeded with foreclosure preparations relative to the Real Estate, with a sale having been set pursuant to the terms of the Deed of Trust for August 27, 2010;

19.     On July 21, 2010, the United States Assistant Trustee, Debra Wertman, filed a Motion to Appoint Trustee. On July 22, 2010, an Order Granting Motion to Appoint Robert Johns as Chapter 11 Trustee was entered by the Court;

20.     Upon receipt of a copy of the aforementioned order, counsel for Home Savings and Loan sent the Trustee a copy of the notice of foreclosure relative to the August 27, 2010 sale, together with copies of the Order, the Notice of Default and the affidavit of counsel as filed with the Court;

21.     In his Motion, the Trustee requests that the automatic stay be reinstated to give him "a reasonable time to determine whether adequate protection payments to Home Savings and Loan can be resumed" (emphasis added) and to allow the Trustee to manage the Real Estate "for the benefit of all interested parties" to include allowing Augusta Apartments, LLC to continue to use 60 of the parking spots located on the Real Estate, in order to maintain its Certificate of Occupancy for a 300 student apartment complex located near the Real Estate;

22.     Although understanding of the fact that the Trustee has had limited involvement with this case to date, Home Savings and Loan objects to any additional amount of time being granted to allow him to determine if he can perhaps begin making adequate protection payments to Home Savings and Loan, in light of the fact that only one payment of $12,000 has been made

on the Indebtedness in approximately a year, the Note, as modified in forbearance, has matured, and the amount needed to simply bring interest payments current exceeds $140,000.00;

23.     Home Savings and Loan further objects to allowing the Trustee to manage the Real Estate "for the benefit of all interested parties" when it is clear that the value of the Real Estate does not exceed the amount of the Indebtedness and, therefore, the Trustee is, in essence, working for the benefit of only Home Savings and Loan under circumstances where it could liquidate its interests in the Real Estate cheaper through foreclosure than by paying the Trustee's commission at some undetermined date in the future;

24.     Home Savings and Loan has indicated a willingness in principle to enter into an agreement with the Trustee which would survive foreclosure, whereby the 60 parking spots needed by Augusta Apartments, LLC to retain its Certificate of Occupancy and the office space formerly utilized by Grand Central and the related debtors remain available for use by the bankruptcy estates of Augusta Apartments, LLC and McCoy Apartments LLC through May 31, 2011, at no cost to the bankruptcy estates other than for payment of utilities and any other charges associated with such use, in exchange for the ability of Home Savings and Loan to proceed forward with liquidation of its interests in the Real Estate at foreclosure on August 27, 2010;

25.     Home Savings and Loan respectfully submits that the aforementioned proposal is appropriate under the circumstances and sufficiently addresses the needs of the Trustee and the respective bankruptcy estates without the extraordinary remedy of reinstatement of the automatic stay;

WHEREFORE, The Home Savings and Loan Company of Youngstown, Ohio, secured creditor, prays that this Honorable Court enter its order:

1.　　Denying the Trustee's Motion;

2.　　Expressly granting Home Savings and Loan relief from the automatic stay provided by 11 U.S.C. § 362(a) so that it may foreclose its liens upon the Real Estate in accordance with the terms of the Note, Deed of Trust and applicable state law on August 27, 2010; and

3.　　Granting such further relief as is equitable and just.


Dated this 3rd day of August, 2010.



　　　　　　　　　　　　　　　　　　　/s/　　　Donald J. Epperly
　　　　　　　　　　　　　　　　　　Donald J. Epperly, W. Va. State Bar #6579

STEPTOE & JOHNSON PLLC　　　　Chase Tower, Sixth Floor
　　　Of Counsel　　　　　　　　　　P.O. Box 2190
　　　　　　　　　　　　　　　　　　Clarksburg, WV 26302-2190
　　　　　　　　　　　　　　　　　　(304) 624-8000
　　　　　　　　　　　　　　　　　　Attorney for The Home Savings and Loan
　　　　　　　　　　　　　　　　　　Company of Youngstown, Ohio

A SUMMARY APPRAISAL OF THE
GRAND CENTRAL BUSINESS CENTER
LOCATED AT
2567 UNIVERSITY AVENUE
MORGANTOWN, MONONGALIA COUNTY,
WEST VIRGINIA

As of:
March 8, 2010



For
Mr. David McKay
The Home Savings & Loan Company
275 Federal Plaza West
Youngstown, Ohio 44501-111

SAMUEL D. KOON
& ASSOCIATES



**Samuel D. Koon**
**& Associates**

141 East Town Street
Suite 310
Columbus, Ohio 43215
614-461-0911
Fax: 614-461-0950

March 25, 2010


Mr. David McKay
The Home Savings & Loan Company
275 Federal Plaza West
Youngstown, Ohio 44501-111

Re:  Grand Central Business Center
      2567 University Avenue
      Morgantown, West Virginia 26505

Dear Mr. McKay:

In accordance with your request, we have appraised the property captioned above. This appraisal is being reported in a summary format. The purpose of this appraisal is to provide an opinion of the market value of the fee simple estate in the subject. The effective date of the value opinion is March 8, 2010, the date of our property viewing. The appraisal is based on market conditions observed as of the current date of our market research, which is March 8, 2010. It is our understanding that the intended use of this appraisal is so that The Home Savings & Loan Company may analyze the property as collateral.

The subject consists of two, multi-tenant office buildings located on a ±5.93 acre non-contiguous site, located in Morgantown, Monongalia County, West Virginia. As discussed in the forthcoming report, it is our opinion that the value of the land is greater than that of the improved site.

The attached study and analysis is subject to the various contingent conditions and assumptions made throughout this report. It is the intent of the appraisers to have completed the appraisal assignment in accordance with accepted appraisal standards promulgated by Title XI of the Federal Financial Institutions Reform, Recovery and

Enforcement Act of 1989 and 1994 (FIRREA), the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation (2010-2011 Edition), and in accordance with the Department of the Treasurer, Office of the Comptroller of the Currency, 12 CFR, Part 34, Subpart C, Appraisals ("Final Ruling").

Based on the analysis contained herein, it is our opinion that the market value of the fee simple estate in the subject, expressed in financial terms equivalent to cash, as is, as of March 8, 2010, is:

<u>TWO MILLION FOUR HUNDRED FIFTY THOUSAND DOLLARS ($2,450,000)</u>

The as is value indication does not include any personal property.

We appreciate the opportunity to be of service to your organization and look forward to working with you again.

Respectfully submitted,

SAMUEL D. KOON & ASSOCIATES, LTD.

By:

Thomas J. Kaliker, MAI

By:

M. Michele Renner, Appraiser

TJK/MMR/ec
Enclosures

# *TABLE OF CONTENTS*

PREFACE

    LETTER OF TRANSMITTAL
    TABLE OF CONTENTS
    SUMMARY OF SALIENT FACTS AND CONCLUSIONS

I.    **INTRODUCTION**
    Assumptions ........................................................................................................ I - 1
    Extraordinary Assumptions .............................................................................. I - 3
    Hypothetical Conditions .................................................................................... I - 3
    Property Identification ....................................................................................... I - 3
    Definition of Value ............................................................................................ I - 3
    Real Property Interest Appraised ...................................................................... I - 4
    Relevant Dates .................................................................................................. I - 5
    Client, Intended User, and Intended Use ......................................................... I - 5
    Most Likely Buyer/User .................................................................................... I - 5
    Ownership and Property History ...................................................................... I - 5
    Legal Description .............................................................................................. I - 5
    Scope of Work .................................................................................................. I - 6
    Approaches to Value ......................................................................................... I - 6
    Applicability of Approaches .............................................................................. I - 8
    Exposure Time and Marketing Period .............................................................. I - 8
    Competency of Appraisers ................................................................................ I - 9

II.    **DESCRIPTIVE DATA** ............................................................................................ I - 10
    Regional Analysis ............................................................................................. II - 1
    Neighborhood Analysis .................................................................................... II - 7
    Description of the Site ...................................................................................... II - 10
    Description of the Improvements ..................................................................... II - 19
    Real Estate Taxes ............................................................................................. II - 25

III.    **ANALYSIS OF HIGHEST AND BEST USE**
    Highest and Best Use as Vacant....................................................................... III - 1
    Highest and Best Use as Improved .................................................................. III - 3

IV.    **SALES COMPARISON APPROACH**
    Summary of Comparable Sales......................................................................... IV - 1
    Adjustment Process........................................................................................... IV - 14
    Value Conclusion.............................................................................................. IV - 17

V.    **SUMMATION AND FINAL RECONCILIATION**
    Reconciliation................................................................................................... V - 1
    Certification...................................................................................................... V - 2

ADDENDUM
    Appraiser License
    Appraiser Qualifications
    34.44 Appraisal Standards
    Engagement Letter
    Legal Descriptions
    Rent Roll

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| Property Identification | The subject consists of two, multi-tenant office buildings located on a ±5.93 acre non-contiguous site. |
| Property Location | 2567 University Avenue, Morgantown, Monongalia County, West Virginia |
| Purpose of the Appraisal | The purpose of this appraisal is to provide an opinion of the market value of the fee simple estate of two, multi-tenant office buildings located on a ±5.93 acre non-contiguous site. |

**Pertinent Dates:**
Date of Viewing — March 8, 2010
"As Is" Market Value — March 8, 2010

**Subject's Physical Attributes:**
Site Area — ±5.93 non-contiguous acres
Zoning — PUD, Planned Unit Development

**Highest and Best Use:**
As Though Vacant — Multifamily residential and retail mixed use
As Improved — Demolition of existing improvements and reuse as multifamily residential and retail mixed use

Exposure Time — 18 months or less

Marketing Period — 18 months or less

**Indication of Market Value:**
Cost Approach — N/A
Income Capitalization Approach — N/A
Sales Comparison Approach — N/A
Land Valuation Analysis — $2,450,000

**Final Opinion of Market Value:**
"As Is" Market Value as of March 8, 2010 — TWO MILLION FOUR HUNDRED FIFTY THOUSAND DOLLARS ($2,450,000)

# ASSUMPTIONS

The Certificate of Appraisal, and report hereto attached, is made expressly subject to the conditions and stipulations following.

The appraiser(s) completed a visual inspection of the property. As such, the appraiser(s) toured and viewed some or all of the accessible portions of the site and improvements; the visual inspection is not meant to imply that the appraiser(s) viewed all of the site or improvements. The visual inspection performed was not intended to function as an inspection of the structural soundness of the site or improvements and was not intended to provide any warranty as to, or guarantee of, the condition of the property and improvements. The exclusive purpose of a visual property inspection is for the appraiser(s) to conduct a viewing of the property in order to complete the appraisal assignment; the visual inspection is not intended to function as a complete property inspection, as is commonly performed by a property inspector or engineer, and should not be considered as such.

No responsibility is assumed by the appraiser for matters which are legal in nature, nor is opinion rendered as to property title, which is assumed to be good and marketable. Unless otherwise stated, no consideration is given to liens or encumbrances against the property. Any liens or encumbrances which may now exist have been disregarded and the property has been appraised as though no delinquency in the payment of general taxes or special assessments exists, and as though free of indebtedness unless otherwise noted.

Information, estimates and opinions contained in this report were obtained from sources considered reliable and believed to be true and correct; however, no responsibility for accuracy can be assumed by the appraiser or appraisers. No single item of information was completely relied upon to the exclusion of the other information and all data was analyzed within the framework of judgment, knowledge and experience of the real estate appraiser or appraisers.

The appraisal is based on the assumption that the property will be competently managed, leased, and maintained by financially sound owners over the expected period of ownership.

The physical condition of the improvements described herein was based on visual inspection. No reliability is assumed for the soundness of members, equipment or soil conditions, since no engineering tests were made.

The improvements are considered to be within the lot lines and, except as herein noted, are in accordance with local zoning and building ordinances. Any plots, diagrams, and drawings found herein are to facilitate and aid the reader in picturing the subject property and are not meant to be used as references in matters of survey.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 14 of 70

The appraiser or appraisers shall not be required to give testimony or appear in court by reason of this appraisal with reference to the property herein described, unless prior arrangements have been made.

The values for land and improvements as contained in the attached report are constituent parts of the total value reported, and neither is to be used in making a summation appraisal by combination with values created by another appraiser. Either is invalidated if so used.

We assume no responsibility for the business decisions of those who become aware of this appraisal opinion. We do not authorize the use of the name of our firm, its constituents, or the MAI designation for publicity in connection with any effort to market the appraised property. We do not authorize any out-of-context quoting from or partial reprinting of this summary or report for public dissemination.

Samuel D. Koon and Thomas J. Kaliker are members of the Appraisal Institute. The Bylaws and Regulations of the Institute require each Member and Candidate to control the use and distribution of each appraisal report signed by such Member or Candidate. Therefore, except as hereinafter provided, the distribution and use of this report is restricted to the party for whom the appraisal report was prepared. Additionally, no part of this appraisal report shall be given to third parties without prior written consent of the signatories of this appraisal report. Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations media, news media, sales media or other media for public communication without the prior written consent of the signatories of this appraisal report.

No responsibility is assumed by the appraiser or appraisers for the presence of any toxic, caustic, noxious, or otherwise harmful materials (hereinafter referred to as "Hazardous Substances") which may now exist. Said "Hazardous Substances" can be of solid, liquid, radioactive, or gaseous nature, and pertain to those presently known as well as those which are discovered in the future. This appraisal is based on the assumption that the property under appraisement is free of "Hazardous Substances," unless otherwise noted herein.

The date of the valuation to which the value estimate conclusions apply is set forth in the letter of transmittal and within the body of the report. The values are based on the purchasing power of the United States dollar as of that date.

Unless otherwise stated, defined and considered within this appraisal report, it is assumed that the subject property is in full compliance with the Americans with Disabilities Act of 1990 (ADA). We have neither the expertise to identify ADA barriers which require modification, nor knowledge of acceptable remedies. No adjustment is made as to ADA compliance, nor is any responsibility assumed for architectural or engineering expertise required to identify ADA non-conformities.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document      Page 15 of 70

## EXTRAORDINARY ASSUMPTIONS

Extraordinary assumption is defined by USPAP (2010-2011) as follows:

> *Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or the integrity of data used in an analysis.*

The subject site is currently improved with two, multi-tenant office buildings. As will be shown in the forthcoming report, the value is determined to be in the land and not in the improvements. As such, we have assumed tenant leases could be terminated should the property transfer for development.

## HYPOTHETICAL CONDITIONS

Hypothetical conditions are defined by USPAP (2010-2011) as follows:

> *Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or the integrity of data used in an analysis.*

This report contains no hypothetical conditions.

## PROPERTY IDENTIFICATION

The subject is located at 2567 University Avenue in Morgantown, Monongalia County. The subject is identified as two, multi-tenant office buildings located on a ±5.93 acre non-contiguous site. The property is further described herein. The subject is located on 11 parcels, identified by the Monongalia County Auditor as map 14 parcels 12.1, 14, 14.1, and 15, as well as map 15 parcels 93.2, 230.2, 231, 232, 233, 233.1, and 273.

## DEFINITION OF VALUE

Market value is the major focus of most real property appraisal assignments and is defined as:

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 16 of 70

*The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:*

*1. Buyer and seller are typically motivated;*

*2. Both parties are well informed or well advised, and acting in what they consider their best interest;*

*3. A reasonable time is allowed for exposure in the open market;*

*4. Payment is made in cash in United States dollars or in terms of financial arrangements comparable thereto; and*

*5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*

*(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)*

## REAL PROPERTY INTEREST APPRAISED

The legal interest appraised for the subject is the fee simple estate. The Appraisal Institute defines the fee simple estate as follows:

*Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.*

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document      Page 17 of 70

## RELEVANT DATES

The following dates are relevant for this report:

| Relevant Dates | |
|---|---|
| Date of the report | March 25, 2010 |
| Date of the property viewing | March 8, 2010 |
| Effective date of the appraisal As Is | March 8, 2010 |

## CLIENT, INTENDED USER, AND INTENDED USE

The client and intended user of this report is The Home Savings & Loan Company. It is our understanding that the intended use of this appraisal is so that The Home Savings & Loan Company may analyze the property as collateral, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. No additional intended users are identified by the appraisers.

## MOST LIKELY BUYER AND/OR TYPICAL USER

The most likely buyer or typical user would be a local, regional, or national buyer or investor/developer.

## OWNERSHIP AND PROPERTY HISTORY

Title to the subject is currently held in the name of Grand Central Building and Grand Central Building Limited Liability Company of Morgantown. The subject is located on 11 parcels, identified by the Monongalia County Auditor as map 14 parcels 12.1, 14, 14.1, and 15, as well as map 15 parcels 93.2, 230.2, 231, 232, 233, 233.1, and 273. Parcels 12.1, 14, 14.1, 15, 233, and 233.1 transferred October 13, 1994 for $465,000. Parcels 93.2, 230.2, 231, and 232 transferred on October 23, 1997 for $150,000. Parcel 273 transferred on January 25, 1999 for an undisclosed amount. The subject represents former student dormitories, which were converted into office use. According to the property owner's representative in 2008, the subject, along with adjacent parcels, was marketed as a site redevelopment opportunity by Coastal Apartment Advisors in Hilton Head Island, South Carolina starting in mid 2007. Copies of five offers were provided to the appraisers, one of which was indicated to have been accepted but fell through. The reason was indicated to be due to the change in West Virginia University's president. Currently, the property owner's

representative has not responded when asked if the subject is still being marketed as a site redevelopment opportunity. It was indicated by the subject's office manager that the office buildings are being marketed, but requests by the appraisers for marketing information were ignored. Discussion with the local zoning authority indicated that a plan submitted in 2008 for development of the site with up to 250 apartments, on-site parking, and some small retail uses is still pending and that there have been no updated plans submitted since then. There have been no known transfers of the subject in the past three years of which we are aware.


## LEGAL DESCRIPTION

A legal description of all parcels except 15 and 233.1 can be found in the Addendum.


## SCOPE OF WORK

This report has been conducted in conformance with the standards of the Appraisal Institute, Title XI of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and 1994 (FIRREA), the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation (2010-2011 Edition), and, as applicable, the appraisal standards of The Home Savings & Loan Company. Client and intended users, intended use, type and definition of value, and effective dates have been previously discussed within the introductory section of this report.

### Appraisal Problem

The assignment is to appraise two, multi-tenant office buildings located on a ±5.93 acre non-contiguous site.

### Subject Information

We have made a number of independent investigations and analyses in fulfilling the requirements to complete this appraisal. In conducting our investigation and analysis, we have relied on data retained in our office, which are updated regularly for use in all assignments. The Monongalia County government planning agencies, and U.S. Census Bureau were contacted for demographic data, land use policies and trends, growth estimates, and employment data. The Monongalia County Auditor, Treasurer, and Recorder provided information on building descriptions, taxes, and ownership. Information regarding zoning, utilities, and other limitations on site utilization was obtained through the appropriate agencies. Neighborhood data was supplemented by a physical viewing of the defined area. Site To Do Business Online provided flood hazard data. Information was requested from the property owner, which included the following:

Case 1:10-bk-00638    Doc 88    Filed 08/03/10    Entered 08/03/10 18:11:12    Desc Main
Document      Page 19 of 70

- Survey, plat map, and legal description
- Copy of the deed/historical ownership information
- Parcel identification numbers and current owner name(s) for the parcels
- Copy of the current tax bill
- Floor plans and number of suites in each building, including gross building area and rentable area
- Copy of any purchase and sale agreements/Broker contact information/Copy of listing, if property is currently for sale or has been listed within the past several years
- Year end 2008 & 2009 real estate income & expenses, as well as the 2010 budgeted operating statement
- Complete list of any recent renovations/construction and itemized costs, as well as any planned upcoming capital expenditures
- Current occupancy and historical average occupancy (2007, 2008, 2009)
- Rent rolls for Jan. 2007, Jan. 2008, and Jan. 2009
- Current rent roll including suite square footage, lease dates, rent, and vacant suites
- Copies of lease summaries or executed leases
  - Quoted rent for space including estimate of expenses for net leases
  - Rent concessions
  - Specific details regarding pending leases or vacant spaces including tenant improvements and leasing commission costs
  - Information on expiring leases
  - Name and contact information for the leasing company/agent for the property
- Copy of ground lease, if applicable
- Any environmental reports of the subject property that you may have

Floor plans, rent rolls, a lease template, the first and last page of tenant's leases, and legal descriptions were provided by the property owner's representative.

Viewing

The subject was physically viewed on March 8, 2010 by Thomas J. Kaliker, MAI and M. Michele Renner.

Data Research

A diligent search for comparable data was conducted. Data was obtained from both public and private sources including the Monongalia County Auditor, Morgantown Planning Department, Co-Star, Loopnet, and Site to Do Business data services. In the case of comparable sales data, an attempt was made to contact buyers, sellers, or a knowledgeable third party to verify the transaction data and ensure that the sales were transacted at arm's length. Unless otherwise noted, all comparable sales were verified. Comparable rentals were verified by the involved parties or a knowledgeable third party such as a leasing agent.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
                        Document        Page 20 of 70



Aerial Photograph of the Subject

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document      Page 21 of 70

## DESCRIPTION OF THE IMPROVEMENTS

The subject improvements consist of two, multi-tenant office buildings, reportedly built in 1970, located on a ±5.93 acre non-contiguous site. The buildings were originally utilized as student dormitories and were converted to office use in the mid-1990s when the current owner purchased them. The north building has five full floors with an additional partial floor, as the building is built into a hill. The south building has four full floors with an additional partial floor, as the building is also built into a hill. As of the date of the property viewing, 5 out of 34 tenants were on a month to month basis, 2 are in the renewal process, 1 has been trading advertising space for free rent, and the remaining 26 leases are expiring in 2010 or first quarter 2011. Current occupancy is approximately 49%.

### Dimensions and Area

The existing improvements contain a rentable area of approximately 64,608 square feet. The gross building area is estimated to be 74,299 square feet based on an estimated 15% common area factor.

### Building Structure and Exterior Finishes

The existing structures consist of brick exterior walls with a basement. The roofs are flat with a rubber surface.

### Interior Layout and Finishes

The layout for each building is dependent on the tenants. The interior walls were indicated to be non-load bearing, and as such, have been moved and reconstructed as needed. The north building contains 65 units, while the south building contains 56 units. One 150 square foot unit on the third floor of the north building is not usable due to water damage from a June 2009 roof leak. The majority of the units are smaller spaces ranging from 170 to 500 square feet and located along a central corridor on each floor. The former dormitory layout creates somewhat shallow offices. The interior finish is similar in both buildings and consists of a combination of 2'x4' acoustic tile, popcorn, and painted drywall ceilings; suspended and 2'x4' recessed fluorescent lighting; painted concrete block and drywall walls; a combination of carpeting, vinyl tile, and limited hardwood flooring; and a combination of vinyl and painted hardwood baseboards.

### HVAC Systems

The buildings are heated via gas-fired forced air furnaces and cooled via electric central air conditioning units. Both buildings are wet sprinklered, and each building has one passenger elevator. The elevators are not climate controlled.

## Age and Condition

The buildings were reportedly built around 1970 and were remodeled in the mid-1990s. They are considered to be in fair condition.

## Site Improvements

Site improvements include concrete stairs and curbs, asphalt paved parking for approximately 275 vehicles, pole and building mounted lighting, a stone retention wall, above ground utility lines, and average landscaping. It is noted that the parking lot is very steep and somewhat awkward to navigate.

The reader is referred to the following pages for typical floor plans and photographs of the subject.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 23 of 70



Typical Floor Plan, North Building



Typical Floor Plan, South Building










Descriptive Data - 2567 University Avenue

 

 

 

Descriptive Data - 2567 University Avenue

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 27 of 70

## REAL ESTATE TAXES

The subject is situated in the taxing district identified as District #12 – Fourth Ward. As previously mentioned, the subject is located on 11 parcels, identified by the Monongalia County Auditor as map 14 parcels 12.1, 14, 14.1, and 15, as well as map 15 parcels 93.2, 230.2, 231, 232, 233, 233.1, and 273. Real property in the State of West Virginia is assessed at 60% of its market value. According to the Monongalia County taxing authority, the levy rate for the subject is 2.5840. The Auditor has assessed the subject property at $795,660. Taxes for 2009, payable in 2010, are in the amount of $20,044.

# HIGHEST AND BEST USE

## Present Use of the Property

The subject contains two, multi-tenant office buildings located on a ±5.93 acre non-contiguous site that is zoned PUD, Planned Unit Development. The buildings were originally utilized as student dormitories and were converted to office use in the mid-1990s when the current owner purchased them. They are considered to be in fair condition.

The most likely buyer or typical user would be a local, regional, or national buyer or investor/developer.

## Highest and Best Use of the Property

The "highest and best use concept" is defined by the <u>Dictionary of Real Estate Appraisal, 5th Ed.</u> (published by the Appraisal Institute), as:

> *The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.*

In analyzing the highest and best use of a property, two steps are necessary. The first step is to analyze the site as if vacant and ready to be improved. After this has been accomplished, the second step is to analyze the property, which includes the land and improvements.

## Highest and Best Use, As Though Vacant

1. Legally Permissible. What uses are permitted by zoning and deed restrictions on the site in question?

2. Physically Possible. What uses are possible based upon the site's size, shape, area, terrain, soil conditions, topography, and access to utilities?

3. Financially Feasible. What possible and permissible uses will produce a net return to the owner of the site?

4. Maximum Productivity. Among the feasible uses, which use will produce the highest net return or the highest present worth?

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document      Page 29 of 70

The highest and best use of land if vacant and available for use may be different from the highest and best use of the improved property. This is true when the improvement is not an appropriate use, but it makes a contribution to the total property value in excess of the site. These four tests have been applied to the subject, as though vacant. In arriving at the estimate of highest and best use, the subject was analyzed as if vacant and available for development.

**Legally Permissible:** The legal restrictions dictate the first constraint, and they take the form of private deed restrictions and the public zoning restrictions. We are not aware of any deed restrictions on the subject. The subject is zoned PUD, Planned Unit Development, as indicated by Morgantown's zoning authority. The purpose of the Planned Unit Development is to encourage flexibility in the development of land in order to promote its most appropriate use; to improve, the design, character, and quality of new developments; to encourage a harmonious and appropriate mixture of uses and/or housing types; to facilitate the adequate and economic provision of streets, utilities, and city services; to preserve critical natural environmental and scenic features of the site; to encourage and provide a mechanism for arranging improvements and sites so as to preserve desirable features; and to mitigate the problems which may be presented by specific site conditions. It is anticipated that planned unit developments will serve to implement the goals, objectives, and strategies of the Morgantown Comprehensive Plan specific to the district or neighborhood in which the PUD is to be located.

Uses permitted in a Planned Unit Development may be any use that is found in the zoning ordinance in any district, subject to approval of the Municipal Planning Commission and City Council. However, the City reserves the right to require that a PUD consist of only residential uses when circumstances warrant. Therefore, from a legal standpoint, the subject site could be improved with a number of residential or commercial uses, provided a plan is submitted and approved by the appropriate planning and zoning authorities.

**Physically Possible Use:** The physical aspects of the site itself dictate the next constraint imposed on the possible use of a property. The size and location are important determinants of potential use. In general, the larger the site, the greater its potential to achieve economies of scale and flexibility in development. Based upon these physical considerations, the subject could be improved with a variety of uses, provided they conform to the physical constraints imposed by the site.

The entire development site contains ±5.93 non-contiguous acres that are significantly sloped and are irregularly shaped, with frontage on University Avenue. The site sits significantly below street level. The site is adequately serviced by all public utilities. According to STDBOnline.com Floodsource Floodscape Flood Hazards Map Number 54061C0114E, with an effective date of January 20, 2010, the subject is located in Zone X, an area determined to be outside the 500-year floodplain. The site area is considered to be large enough for a variety of residential or commercial uses. It is noted that significant site

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 30 of 70

work could potentially be required due to the steep topography. As such, virtually any type of permitted development, assuming the building would be sized appropriately in order to achieve maximum utilization of the site, would find it suitable.

**Financially Feasible Uses:** The third criterion which must be met by all legally permissible uses is that the appropriate use be supported and financially feasible. Most important when considering an appropriate use is the relationship of potential uses to the surrounding land uses and the supporting facilities which it may require. Generally, for a use to be financially feasible, it needs to conform to the surrounding land uses. Land uses in the immediate area are generally single and multifamily residential. As discussed in the Descriptive Data section of this report, the subject is desirably located in proximity to West Virginia University's downtown campus, the Evansdale/Health Sciences campus, Ruby Memorial Hospital, Mon General Hospital, and Mylan Pharmaceuticals. It is also in proximity to the Personal Rapid Transit System (PRT) and the Mountain Line Transit Authority. Additionally, the subject is considered to be in the Sunnyside neighborhood. The Campus Neighborhoods Revitalization Corporation (CNRC), a collaborative partnership between the City of Morgantown and West Virginia University, is working with Environmental Planning and Design to develop a revitalization plan for the Sunnyside neighborhood known as the Sunnyside Up Project. The most appropriate use of the subject is considered to be for some sort of residential or mixed use development. This would be consistent with the subject's location and would enhance the immediate neighborhood.

**Maximally Productive:** The last step in our analysis involves determining what physically possible, legally permissible, financially feasible use would maximize value. In the final analysis, a determination must be made as to which feasible use is the highest and best use. Under the present zoning, the site could be developed with a wide array of uses. It is difficult to determine which would be the most profitable use without an extensive market study. Single family residential development would not be desirable based on the current market. However, based on market conditions and considering the qualities of the subject and its neighborhood, it is our opinion that the highest and best use for the property would be to develop the site with some type of commercial mixed use, specifically multifamily residential and retail mixed use development.

Highest and Best Use, As Improved

In analyzing the highest and best use of the subject as improved, the same criteria will be applied. The improvements are former student dormitories converted to office use. The subject, as improved, appears to conform to the configuration of the site and satisfy the physical constraints imposed by the site. With regard to legal permissibility, the subject appears to represent a legal conforming use under the current Planned Unit Development zoning. The existing improvements are not considered to conform to the surrounding uses, and the subject buildings are considered to be in fair physical condition.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 31 of 70

As of the date of the property viewing, 5 out of 34 tenants were on a month to month basis, 2 are in the renewal process, 1 has been trading advertising space for free rent, and the remaining 26 leases are expiring in 2010 or first quarter 2011. Leases are written such that the lessor, upon providing 30 day notice, has the unconditional option of relocating the tenant to another location within the subject, at the lessor's sole discretion. The reader is referred to the Addendum for a copy of the rent roll.

Occupancy as of November 2008, inclusive of month to month tenants, was 46.2%. Occupancy according to a March 2009 rent roll was 48%. Current occupancy is approximately 49%. Average historical occupancy for the subject was requested but not provided. A limited operating statement for the subject for August and September 2009 indicates a negative income. The subject's 2007 profit and loss statement also indicated a negative income. Additional profit and loss statements were requested but were not provided to the appraisers. Significant tenant improvements would need to be offered to increase the buildings' occupancy. It was indicated that no TI is currently offered to tenants. Resale of the buildings in "as is" condition would be anticipated to yield a low rate per square foot. Current asking rent for the subject is $12 per square foot, gross. Lease rates signed over the past six months range from $7.20 to $16.67 per square foot, with an average of $11.54 per square foot, gross.

Based on the subject's historical occupancy, fair condition, lack of tenant improvement allowance, and shallow office design due to conversion from student dormitories, it is our opinion that a stabilized occupancy of 60% could be reasonably expected. Requests for historical expenses for the subject were not provided. Limited expense information from August and September 2009 varied significantly between the two months; however, it appears that building insurance runs approximately $0.22 per square foot, and utilities run approximately $2.00 per square foot, annually. Additionally, we have referenced costs for the subject's region according to the *Institute of Real Estate Management 2009 Income/Expense Analysis for Office Buildings* as shown in the table on the following page. We note that the subject's actual taxes, as previously discussed within the Descriptive Data section of this report, are significantly less than IREM's indicated price per square foot for the region. Repairs and maintenance fees, utilities, janitorial, and administrative fees reflect a stabilized occupancy of 60%. Projects similar in size to the subject generally command a management expense within the 3% to 5% range and, as such, we have concluded to a 4% management fee. Based on the subject's age and condition, it is our opinion that a replacement reserve of $0.20 per square foot is appropriate.

| OPERATING EXPENSES: | IREM 2009 | | | Resolution | |
| | Low/SF | High/SF | Med/SF | Total | Per SF |
|---|---|---|---|---|---|
| Real Estate Taxes | $3.08 | $9.17 | $6.43 | $20,044 | $0.31 |
| Building Insurance | $0.21 | $0.41 | $0.32 | $14,214 | $0.22 |
| Repairs and Maintenance | $1.32 | $3.28 | $2.04 | $58,147 | $1.50 |
| Services | $0.90 | $1.72 | $1.32 | $58,147 | $0.90 |
| Utilities | $0.85 | $2.68 | $1.71 | $81,406 | $2.00 |
| Janitorial | $1.10 | $1.82 | $1.52 | $42,641 | $1.10 |
| Management | $0.61 | $1.39 | $1.06 | $17,832 | $0.28 |
| Administrative | $0.62 | $1.42 | $0.97 | $25,197 | $0.65 |
| Replacement Reserve | N/A | N/A | N/A | $12,922 | $0.20 |
| Total Expenses: | $8.69 | $21.89 | $15.37 | $330,550 | $7.16 |

As previously discussed, average contract rent over the past six months averages $11.54 per square foot on a gross basis. As the subject's contract rent represents leases that are all short term or month to month, we have concluded to a market rent of $11.50 per square foot for the subject. At 60% stabilized occupancy, this yields an effective gross income of $445,795. Subtracting the $330,550 in total expenses as indicated in the table above, yields a net operating income of $115,245.

Based upon the First Quarter, 2010 PricewaterhouseCoopers Korpacz survey, the overall capitalization rate for the national suburban office market (noninstitutional grade) ranged from 7.00% to 15.00%, with an average of 10.20%. Additionally, a current listing of a 71% occupied, 43,726 square foot, office building in Wheeling, West Virginia, indicates a capitalization rate of 10%. A current listing of a 100% occupied, 61,000 square foot, office building in Morgantown, West Virginia, indicates a capitalization rate of 10.14%. In consideration of the above information, as well as the historical occupancy and condition of the subject, it is our opinion that an overall capitalization rate of 11% is appropriate for the subject.

The estimated net income, after reserves, is divided by the overall capitalization rate:

$115,245 Net Operating Income / 11%  = $1,047,683 or $1,050,000, rounded

In 2008, copies of five offers to redevelop the subject were provided to the appraisers. No offers were for the value of the buildings per se, rather the intention was for redevelopment of the site for multifamily use.  Four of the five offers specifically referred to student housing. None of the offers came to fruition, and a representative of the property owner did not indicate whether the subject is still being marketed as a site redevelopment opportunity. However, in speaking with local businessmen, the subject was acknowledged as a desirable location due to its proximity to West Virginia University's downtown campus, the Evansdale/Health Sciences campus, Ruby Memorial Hospital, Mon General Hospital, and Mylan Pharmaceuticals. It is also in proximity to the Personal Rapid Transit System (PRT) and the Mountain Line Transit

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 33 of 70

Authority. As will be shown in the forthcoming land valuation analysis, land value has escalated in the subject's neighborhood to a level where the value of the subject as vacant exceeds the value as improved. Therefore, the highest and best use of the property is for the improvements to be razed, yielding to new development, such as multifamily residential and retail mixed use.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document      Page 34 of 70

# LAND VALUATION ANALYSIS

## Introduction

The land valuation analysis is a method of estimating value by comparing the subject to similar sites which have transferred within the marketplace. The comparable sales are analyzed with respect to the date of sale, determination that there were no unusual circumstances affecting the sale price, confirmation of the sale data, and most importantly, the degree of comparability of the sale property to the subject. The resulting value opinion is reliable to the extent that the properties are comparable and that the appraisers' judgment of proper adjustments is sound.

## Analysis of Comparable Sales

Research of public sources together with a thorough investigation of the market area revealed the following sales of sites located within the Morgantown, West Virginia area, which were used to provide an opinion of the value of the fee simple estate in the subject. Conclusions drawn from this information were synthesized with the opinion of informed sources in the area. When possible, either the buyer or seller, or a third party, were interviewed to determine motivational factors affecting the sale price and the degree of comparability to the subject. Details regarding those sales considered most pertinent to the analysis of the subject may be found in the table below and on the following pages.

| | Location | Date | Price | Acres | Price/Acre |
|---|---|---|---|---|---|
| | **Summary of Comparable Land Sales** | | | | |
| 1 | Route 705/Stewartstown Rd. Morgantown | May-07 | $3,932,000 | 7.441 | $528,424 |
| 2 | Earl Core Rd. Morgantown | Jan-07 | $2,100,000 | 2.80 | $750,000 |
| 3 | 235 Jones Ave. Morgantown | Feb-08 | $7,450,000 | 5.55 | $1,342,342 |
| 4 | 3119 University Ave. Morgantown | Current listing: Mar-10 | $3,500,000 | 3.50 | $1,000,000 |
| 5 | 1644 Mileground Rd. Morgantown | Current listing: Mar-10 | $1,850,000 | 3.95 | $468,354 |

According to the property owner's representative in 2008, the subject, along with adjacent parcels, was marketed as a site redevelopment opportunity by Coastal Apartment Advisors in Hilton Head Island, South Carolina starting in mid 2007. We note that in 2008 the property owner's representative provided copies of five purchase offers for the subject site in

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 35 of 70

combination with additional surrounding parcels. These offers are summarized in the table below.

| | Company | Offer | Date | Acreage | Price/Acre |
|---|---|---|---|---|---|
| | **PREVIOUS OFFERS FOR THE SUBJECT** | | | | |
| 1 | ACC OP Development, LLC | $7,100,000 | December 7, 2007 | 7.1 | $1,000,000 |
| 2 | Cortland Partners, LLC | $7,875,000 | December 7, 2007 | 7.18 | $1,096,797 |
| 3 | PCO Student Housing, LLC | $6,500,000 | December 7, 2007 | 7.18 | $905,292 |
| 4 | GHM Communities Trust | $4,800,000 | December 7, 2007 | 7.19 | $667,594 |
| 5 | Crowne Partners, Inc. | $4,500,000 | November 19, 2007 | 9 | $500,000 |

It was indicated to the appraisers that offer number one was accepted by the property owner, but that the deal fell through due to the resignation of West Virginia University's president. The offers were contingent upon rezoning to a Planned Unit Development, as well as other items. The subject was subsequently rezoned to a PUD district in late 2008. According to the outline plan submitted to Morgantown's Planning Department in 2008, the PUD zoning will combine additional adjacent land for a total of 7.18 acres to be developed with up to 250 apartments, on-site parking, and some small retail uses to support the development. Current discussion with the local zoning authority indicated that this plan is still pending and that there have been no updated plans submitted since 2008. Currently, the property owner's representative has not responded when asked if the subject is still being marketed as a site redevelopment opportunity. We note that in 2008, American Campus Communities (which originally offered to buy the subject site), purchased 5.55 acres intended for student housing development south of the subject.

| LAND SALE 1 | |
|---|---|
| LOCATION | Route 705 and Stewartstown Road, Morgantown, West Virginia |
| GRANTOR | Gateway Towne Centre LLC |
| GRANTEE | Kroger Limited Partnership I |
| DATE OF SALE | May 9, 2007 |
| LIST PRICE | $3,932,000 |
| SITE SIZE | 7.441 Acres |
| TOPOGRAPHY | Generally level |
| CONFIGURATION | Irregular |
| ZONING | Unzoned |
| UTILITIES | All Public |
| UNIT PRICE | $528,424/Acre |
| COMMENTS | This represents the purchase of a site at the Suncrest Towne Center, a 52-acre lifestyle center. The site was subsequently developed with a Kroger grocery store. |

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 37 of 70



Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 38 of 70

## LAND SALE 2

**LOCATION**     107 Earl Core Road, Morgantown, West Virginia

**GRANTOR**     Merrywoods Properties, LLC

**GRANTEE**     Glenmark Holding Limited Liability Company

**DATE OF SALE**   January 8, 2007

**SALE PRICE**    $2,100,000

**SITE SIZE**     2.8 Acres

**TOPOGRAPHY**   Generally level, with steep elevation to the rear

**CONFIGURATION**  Irregular

**ZONING**     Was rezoned from I-1, Industrial to B-2, Service Business

**UTILITIES**     All Public

**UNIT PRICE**    $750,000/Acre

**COMMENTS**    This represents the sale of a site where a Chrysler dealership had been located. The developer indicated there was no value in the building, and the site was purchased to develop a retail shopping plaza. Total site acreage is 3.458 acres, with an indicated approximate 2.8 usable acres due to the topography.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 39 of 70



Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document      Page 40 of 70

| LAND SALE 3 | |
|---|---|
| LOCATION | 235 Jones Avenue, Morgantown, West Virginia |
| GRANTOR | Sunnyside Commons LLC |
| GRANTEE | Campus Communities Operating Partnership LP |
| DATE OF SALE | February 15, 2008 |
| LIST PRICE | $7,450,000 |
| SITE SIZE | 5.55 Acre |
| TOPOGRAPHY | Significantly sloped but mostly usable acreage |
| CONFIGURATION | Irregular |
| ZONING | R-3, Multi-Family Residential |
| UTILITIES | All Public |
| UNIT PRICE | $1,342,342/Acre |
| COMMENTS | This represents the sale of a site which was purchased with the intent to demolish the existing apartments and build new student housing. Due to the downturn in the economy, demolition has been put on hold, and the existing apartments are currently functioning as student housing in the interim. |



Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 42 of 70

| LAND SALE 4 |
|---|

**LOCATION**  3119 University Avenue, Morgantown, West Virginia

**GRANTOR**  University Foods

**GRANTEE**  N/A

**DATE OF SALE**  Current listing: Mar-10

**SALE PRICE**  $3,500,000

**SITE SIZE**  3.50 Acres

**TOPOGRAPHY**  Gently sloping

**CONFIGURATION**  Mostly Rectangular

**ZONING**  B-2, Service Business

**UTILITIES**  All Public

**UNIT PRICE**  $1,000,000/Acre

**COMMENTS**  This represents the current offering of a site marketed as a redevelopment opportunity and owned by two estates. The listing agent indicated the value is in the land. The site is currently improved with a former Bilo and Foodland Fresh, which is being leased by a few small tenants. In 2008, the listing agent indicated a couple offers were pretty close to closing but did not occur. Since then, there has been limited interest which was indicated to be due to the downturn in the economy, as well as an active neighborhood association that has voiced its opinion on restrictions for the site's development. It was indicated that while the asking rate around town is approximately $1,000,000, this site is somewhat overpriced.



Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 44 of 70

| LAND SALE 5 | |
|---|---|
| LOCATION | 1644 Mileground Road, Morgantown, West Virginia |
| GRANTOR | N/A |
| GRANTEE | N/A |
| DATE OF SALE | Current listing: Mar-10 |
| SALE PRICE | $1,850,000 |
| SITE SIZE | 3.950 Acres |
| TOPOGRAPHY | Wooded; rear drops off significantly |
| CONFIGURATION | Irregular |
| ZONING | Unzoned |
| UTILITIES | All Public |
| UNIT PRICE | $468,354/Acre |
| COMMENTS | This represents the current offering of a site marketed as a redevelopment opportunity. Approximately 40% of the site with frontage along Mileground Road is usable, while the topography is wooded and shifts to the rear and drops off significantly. It was indicated that this site has been listed for a couple years with only passing interest indicated. |

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 45 of 70





Comparable Land Sales Map

These sales have been compared to the subject based on a price per acre comparison. The unadjusted prices range from $468,354 to $1,342,342 per acre. The comparable sales have been adjusted for differences in property rights conveyed, sale and market conditions, location, zoning, size, and site conditions compared to those of the subject. The following chart details the adjustment process followed by a discussion of the adjustments.

Case 1:10-bk-00638    Doc 88    Filed 08/03/10    Entered 08/03/10 18:11:12    Desc Main
Document    Page 47 of 70

## LAND SALES ADJUSTMENT GRID
### 2567 University Avenue, Morgantown, West Virginia

| | SUBJECT | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 |
|---|---|---|---|---|---|---|
| Street | Route 705/Stewartstown Rd. | Route 705/Stewartstown Rd. | Earl Core Rd. | 235 Jones Ave. | 3119 University Ave. | 1644 Mileground Rd. |
| City/County | Morgantown | Morgantown | Morgantown | Morgantown | Morgantown | Morgantown |
| Sale Date | - | May-07 | January-07 | February-08 | Current listing: Mar-10 | Current listing: Mar-10 |
| Sale Price | - | $3,932,000 | $2,100,000 | $7,450,000 | $3,500,000 | $1,850,000 |
| Acres | 5.93 | 7.441 | 2.80 | 5.55 | 3.5 | 3.95 |
| Unadjusted Sale Price/Acre | | $528,424 | $750,000 | $1,342,342 | $1,000,000 | $468,354 |
| Property Rights Conveyed | - | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Adjustment | | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | - | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| Adjustment | | 0% | 0% | 0% | 0% | 0% |
| Market Conditions (Time) | 10-Mar | Superior | Superior | Superior | Listing | Listing |
| Adjustment | | -20% | -20% | -20% | -25% | -25% |
| Net Adjustment | - | -20% | -20% | -20% | -25% | -25% |
| Adjusted Price/Acre | | $422,739 | $600,000 | $1,073,874 | $750,000 | $351,266 |
| Physical Characteristics | | | | | | |
| Location | Good | 0% | 10% | 0% | 0% | 10% |
| Zoning | PUD | 0% | 0% | 0% | 0% | 0% |
| Site Conditions | Below street level, sloped | -20% | -20% | -10% | -20% | 0% |
| Size | 5.93 | 10% | -15% | 0% | -15% | -10% |
| Net Adjustment | - | -10% | -25% | -10% | -35% | 0% |
| Total Adj. Price/Acre | | $380,465 | $450,000 | $966,486 | $487,500 | $351,266 |

**Property Rights Conveyed:** All of the sales represent the conveyance of the fee simple estate; therefore, no adjustments for property rights conveyed are necessary.

**Conditions of Sale:** We are aware of no unusual circumstances surrounding any of the sales. Therefore, no adjustments for conditions of sale have been applied.

**Market Conditions (Time):** Since the effective date of our market value opinion is March 8, 2010, adjustments must be made to the land sales to reflect current market conditions. Adjustments reflect not only the passage of time, typically with modest appreciation due to inflationary increases, but also changes in market conditions. The sales that are included in this analysis occurred between May 2007 and February 2008, as well as two current listings. The market has fluctuated over this time period, reflecting the subprime crisis that began in August 2007, and the ensuing credit crisis that began in September 2008. Due to the decline in the market, we feel that a strong downward adjustment is warranted for sales occurring prior to the Fall of 2008. As such, comparables #1, #2, and #3 have been adjusted downward due to superior market conditions at the time of their respective transfers, as compared to the present. Comparables #4 and #5 have been adjusted downward to reflect that listings often sell below the asking price, as well as the fact that both comparables have been listed for several years without transferring.

**Location:** This adjustment considers access, exposure and overall location. An important component of location for an office parcel is visibility and the economic employment base in the area. The subject and all comparables are considered to be good development locations in the Morgantown area; however, adjustments are warranted. Comparables #2 and #5 have been adjusted upward due to their slightly less desirable locations, as compared to the subject.

**Zoning:** The subject is zoned PUD, Planned Unit Development, which allows for both residential and commercial development. All comparables benefit from commercial or residential zoning, and we have considered infill land in the Morgantown area to be similar in regard to zoning. As such, no adjustments are deemed necessary.

**Site Conditions:** Overall, the subject is significantly sloping and sits significantly below street level. All public utilities are present on all the sites, requiring no adjustment. Downward adjustments in varying degrees have been applied to comparables #1 through #4 in acknowledgement of their superior site conditions, as compared to the subject. No adjustment was indicated for comparable #5.

**Size:** The various sales have sizes ranging from 2.80 acres to 7.44 acres, as compared to the subject's ±5.93 acres. An upward adjustment was indicated for comparable #1, while downward adjustment has been applied to comparables #2, #4, and #5 to reflect that smaller sites tend to sell for more on a price per acre basis than their similar, larger counterparts. No size adjustment was indicated for comparable #3.

Case 1:10-bk-00638  Doc 88  Filed 08/03/10  Entered 08/03/10 18:11:12  Desc Main
Document  Page 49 of 70

After completing the comparable analysis on a price per acre basis, an adjusted range of approximately $351,266 to $966,486 per acre was indicated. This range in values is due to the differences in the physical attributes of the properties and the economic conditions which existed at the time of their respective transfers. Each is considered to provide pertinent data to the valuation of the subject. It is significant to note that in 2008 five offers ranging from approximately $500,000 to $1,100,000 per acre were provided to the appraisers by the property owner's representative. No offers were for the office buildings per se, rather the offers were for site redevelopment into multifamily housing. Four offers specifically referred to student housing. One offer, for $1,000,000 per acre, was accepted but subsequently fell through.

The subject site's location is considered to fall within the Sunnyside neighborhood. The Campus Neighborhoods Revitalization Corporation (CNRC), a collaborative partnership between the City of Morgantown and West Virginia University, is working with Environmental Planning and Design to develop a revitalization plan for this neighborhood, known as the Sunnyside Up Project. Discussion with local businessmen, including developers, indicated the subject site is considered to be centrally and desirably located due to its close proximity to the various University of West Virginia campuses, public transportation, local hospitals, and Mylan Pharmaceuticals which is a large business presence in Morgantown. It was also indicated that a lack of infill land would compress the value of the subject site. A range of $800,000 to $1,000,000 per acre for the subject site was indicated by businessmen as being within an appropriate range due to the subject's good location prior to the virtual collapse of the financial industry. However, local businessmen also stressed that the lack of visibility due to the site sitting below University Avenue, in combination with its significant slope, would affect its value in their opinion.

Discussion with a local broker at Petroplus Lane, LLC in Morgantown indicated that American Campus Communities (which originally offered to buy 7.1 acres, including the subject site, for $7,100,000), purchased 5.55 acres south of the subject for $7,450,000 at the apex of the student housing market in February 2008. Since then, he indicated that the student housing market has leveled off and has not yet returned to its former peak. However, he did stress that student housing in Morgantown is still somewhat strong and that there's a fair amount of competition but the difficulty in securing financing has impacted the market.

We note that discussion with the local zoning authority indicated that little development was taking place in Morgantown due to the economic downturn. Specifically, the subject's pending development plan was felt to be on hold due to the economy. Since the collapse, it has become virtually impossible to obtain financing for commercial development. Our belief is that land values will return to their former levels once the banking industry begins to fund construction and commercial development is able to resume. This time frame is unknown; however, based on the historical strength of Morgantown as a university town, the impact of the downturn is considered to be less for the development potential of student housing than it would be for another property type.

Case 1:10-bk-00638  Doc 88  Filed 08/03/10  Entered 08/03/10 18:11:12  Desc Main Document  Page 50 of 70

In consideration of the above analysis, it is our judgment that a market value toward the low end of the range, at $450,000 per acre, is appropriate. The following calculation is pertinent.

$450,000 per acre x 5.93 net acres = $2,668,500

In order for the subject to be used as vacant land, the subject's improvements must be razed. According to the Marshall Valuation Service, a value of $3 per square foot or $222,898 (74,299 SF office buildings x $3/SF = $222,898) is appropriate for razing. Therefore, the following calculation is pertinent.

$2,668,500 minus $222,898 in razing costs equals $2,445,602, rounded to $2,450,000

Based on the preceding analysis, it is our opinion that the market value of the fee simple estate in the subject 5.93 acre site, expressed in financial terms equivalent to cash, as of March 8, 2010, is:

<u>TWO MILLION FOUR HUNDRED FIFTY THOUSAND DOLLARS ($2,450,000)</u>

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document      Page 51 of 70

## SUMMATION AND FINAL RECONCILIATION

The land valuation analysis via a sales comparison approach was utilized exclusively in the valuation of the subject. The finding of our analysis is summarized as follows:

| | |
|---|---|
| Cost Approach | N/A |
| Income Capitalization Approach | N/A |
| Sales Comparison Approach | N/A |
| Land Valuation Analysis | $2,450,000 |

The cost approach was not completed due to the age of the improvements and the inherent difficulty in accurately estimating accrued depreciation. A brief exercise in the income capitalization approach deemed this approach inappropriate due to the fair condition of the buildings, historically low occupancy, market rent, rezoning and plan submission of the site for student housing, and land value in the area. The sales comparison approach was deemed inappropriate as the typical buyer would consider the income-producing capabilities of the subject's two multi-tenant buildings, which was shown to be less than the land value in the area.

The land valuation analysis via a sales comparison approach entailed the analysis and research of several comparable land sales in the subject neighborhood. The sales felt most comparable to the subject site were summarized, and adjustments were made for differences in date of sale, location, size, and other differences on a site by site basis. Adjustments were, overall, relatively minor and the assembled sales were considered to provide a good indication as to the value of the subject site. As the land valuation analysis was the only applicable approach, it has been utilized exclusively in the valuation of the subject.

Based upon our analysis and the market conditions which existed as of March 8, 2010, it is our opinion that the market value of the fee simple estate of the subject, in terms of financial arrangements equivalent to cash, is:

<u>TWO MILLION FOUR HUNDRED FIFTY THOUSAND DOLLARS ($2,450,000)</u>

The as is value indication does not include any personal property.

Case 1:10-bk-00638   Doc 88   Filed 08/03/10   Entered 08/03/10 18:11:12   Desc Main
Document   Page 52 of 70

# CERTIFICATION

We certify that to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- We have made a personal inspection of the property that is the subject of this report. (The visual inspection performed was not intended to function as an inspection of the structural soundness of the site or improvements and was not intended to provide any warranty as to, or guarantee of, the condition of the property and improvements. It is not intended to function as a complete property inspection, as is commonly performed by a property inspector or engineer, and should not be considered as such.)
- No one provided significant real property appraisal assistance to the person(s) signing this certification.
- As of the date of this report, Thomas J. Kaliker, MAI has completed the continuing education program of the Appraisal Institute.
- Samuel D. Koon & Associates, Ltd. has performed appraisal services with respect to the subject within the past three years.

Thomas J. Kaliker, MAI
West Virginia Certified General Real Estate
Appraiser CG388

M. Michele Renner, Appraiser

Case 1:10-bk-00638    Doc 88    Filed 08/03/10    Entered 08/03/10 18:11:12    Desc Main
Document      Page 53 of 70

# ADDENDUM

State of West Virginia

WV Real Estate Appraiser Licensing & Certification Board

This is to certify that

**THOMAS J KALIKER**
**141 E. TOWN STREET**
**COLUMBUS OH 43215-**
**CERTIFIED GENERAL    CG388**
**Expiration Date 09/30/2010**

has met the requirements of the law, and is authorized to appraise real estate and
real property in the State of West Virginia.

_____ Executive Director

## QUALIFICATIONS OF THOMAS J. KALIKER, MAI

- Executive Vice President for Samuel D. Koon & Associates, Ltd., Real Estate Consultants and Appraisers. Work scope includes appraisals, feasibility studies, consulting services and expert legal witnessing for lending institutions and private clients throughout the Columbus metropolitan area and the Midwestern United States.

### Educational Background:

- Bachelor of Science Degree in Chemistry, The Ohio State University, 1967.
- Master of Business Administration Degree, University of West Florida, 1971.

### Real Estate Experience:

- Fee appraiser since March 1972
- Certified General Real Estate Appraiser, State of Ohio
- Instructor, Real Estate Appraisal, Appraisal Institute
- Instructor, Real Estate Appraisal, Otterbein College
- Instructor, Real Estate Appraisal, The Ohio State University

### Types of Properties Appraised:

- Hotels
- Apartments
- Subdivisions
- Potential Development Land
- Shopping Centers
- Nursing Homes
- Manufacturing Plants
- Special Purpose Properties
- Office Buildings
- Medical Office Buildings
- Warehouses
- Residential
- Golf Courses
- Hospitals
- Restaurants
- Subsidized Housing

### Professional Affiliations:

- Member, Appraisal Institute, MAI Designation
- Member, Appraisal Institute, SRA Designation
- President, Ohio Buckeye Chapter of the Appraisal Institute, 1991
- President, Society of Real Estate Appraisers, 1986
- Discussion Leader for the Young Advisor Council, Society of Real Estate Appraisers
- Associate Member, Ohio Health Care Association

## QUALIFICATIONS OF M. MICHELE RENNER

- Independent fee appraiser with Samuel D. Koon & Associates, Ltd., Real Estate Consultants and Appraisers. Work scope includes appraisals, feasibility studies, and consulting services for lending institutions and private clients throughout the Columbus metropolitan area and the Midwestern United States.

**Educational Background:**

- Bachelor of Arts Degree in German with a minor in Economics, University of Richmond, Virginia

**Professional Experience:**

- Fee appraiser with Samuel D. Koon & Associates, Ltd. since July 2006

**Real Estate Education:**

- Completed credit requirements for Courses 110 and 112 (Principles and Procedures) and Course 410 USPAP National 15-hour course sponsored by The Appraisal Institute

**Types of Properties Appraised:**

- Worship Facilities
- Medical Office Buildings
- Parking Facilities
- Automobile Dealerships
- Development Land
- Office Buildings
- Apartments
- Truck Terminals

- Student Housing
- Office/Warehouse Facilities
- Flex Buildings
- Day Care Centers
- Restaurants
- Retail Buildings
- Condominiums

<u>34.44 Appraisal Standards</u> (OCC)

(a)     <u>Minimum standards</u>.  For federally related transactions, all appraisals shall at a minimum:

    (1)     Conform to the Uniform Standards of Professional Appraisal Practice ("USPAP") adopted by the Appraisal Standards Board of the Appraisal Foundation, except that the Departure Provision of the USPAP shall not apply to federally related transactions:

    (2)     Disclose any steps taken that were necessary or appropriate to comply with the Competency Provision of the USPAP:

    (3)     Be based upon the following definition of market value:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

    1.     Buyer and seller are typically motivated.
    2.     Both parties are well-informed or well-advised and acting in what they consider their own best interests.
    3.     A reasonable time is allowed for exposure in the open market.
    4.     Payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto.
    5.     The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

    (4)(I)     Be written and presented in a narrative format or on forms that satisfy all the requirements of this section:

    (ii)     Be sufficiently descriptive to enable the reader to ascertain the estimated market value and the rationale for the estimate: and

    (iii)     Provide detail and depth of analysis that reflect the complexity of the real estate appraised:

    (5)     Analyze and report in reasonable detail any prior sales of the property being appraised that occurred within the following time periods:

        (I)     For 1-to-4 family residential property, one year preceding the date when the appraisal was prepared; and

(ii)     For all other property, three years preceding the date when the appraisal was prepared:

(6)     Analyze and report data or current revenues, expenses, and vacancies for the property if it is and will continue to be income producing:

(7)     Analyze and report a reasonable marketing period for the subject property:

(8)     Analyze and report on current market conditions and trends that will affect projected income or the absorption period to the extent they affect the value of the subject property:

(9)     Analyze and report appropriate deductions and discounts for any proposed construction, or any completed properties that are partially leased or leased at other than market rents as of the date of the appraisal, or any tract developments with unsold units:

(10)     Include in the certification required by the USPAP an additional statement that the appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan:

(11)     Contain sufficient supporting documentation with all pertinent information reported so that the appraiser's logic, reasoning, judgment, and analysis in arriving at a conclusion indicate to the reader the reasonableness of the market value reported:

(12)     Include a legal description of the real estate being appraised, in addition to the description required by the USPAP:

(13)     Identify and separately value any personal property, fixtures, or intangible items that are not real property but are included in the appraisal, and discuss the impact of their inclusions or exclusions on the estimate of market value and

(14)     Follow a reasonable valuation method that addresses the direct sales comparison, income, and cost approaches to market value, reconciles those approaches, and explains the elimination of each approach not used.

(b)  Unavailability of information.   If information required or deemed pertinent for the completion of an appraisal is unavailable, that fact shall be disclosed and explained in the appraisal.

# The Home Savings & Loan Company

February 10, 2010

Samuel D. Koon
Samuel D. Koon & Associates
141 E. Town St.
Columbus, Ohio 43215
614-461-0911
614-461-0950 facsimile

Re:    **Engagement Letter**
       **Grand Central Business Center**
       2567 University Avenue
       Morgantown, WV

Dear Sam,

Per our earlier emails, attached is the formal engagement letter in behalf of The Home Savings and Loan Company, I hereby request and engage you to prepare a real estate appraisal of the property cited above. I emailed you a rent roll and contact information earlier. Your analysis should be presented in a Summary Report Format. The report must be inspected (physically observed) and signed by the appraiser engaged.

The purpose of the appraisal is to estimate the market value of the subject property, as requested herein, so that Home Savings may appropriately analyze the property as collateral. Market value is defined as:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

> 1) Buyer and seller are typically motivated; Both parties are well informed or well advised, and acting in what they consider their best interests; A reasonable time is allowed for exposure in the open market;

> 2) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

> 3) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

All communication between The Home Savings and Loan Company and you pertaining to the subject property is incorporated herein and is an integral part of our agreement.

Your analyses of the property must be completed upon the following premises:

| Valuation Premise | Market Value |
|---|---|
| Premise Qualifier | As Is |
| Property Interest | Leased Fee |

The Home Savings and Loan Company requires a scope of work that is commensurate with the complexity of the assignment. This should include all applicable approach to value, a detailed inspection of the subject property and neighborhood.

Capitalization and discount rates selection are extremely important and must reflect current and forward thinking data. Rate selection should reflect more than one methodology from among the following: recent sales, recent listings, investor and broker interviews, weighted average cost of capital techniques, and published sources such as Korpacz, RealtyRates.com. and others.

The scope and content of your appraisal should follow generally accepted practices as set forth in the Uniform Standards of Professional Appraisal Practice, FIRREA standards, and the attached Home Savings Scope of Work Guidelines. It is a requirement a copy of this signed letter be included within the addenda of the final report and a copy of the appraisal compliance checklist (attached).

| Agreed Date of Completion and Delivery | March 10, 2010 |
|---|---|
| Fee | $3,000 |
| Number of Copies | Two (David McKay Home Savings) |
| PDF Delivery Required | Email PDF to Greg@Vantell.com |
| Review Checklist Required | Yes (see attached) |

Two hard copies of the completed appraisal report and invoice should be mailed to the client and intended user:

**Mr. David McKay**
**The Home Savings & Loan Company**
**275 Federal Plaza West**
**Youngstown, Ohio 44501-1111**

It is essential that The Home Savings and Loan Company receive the appraisal report(s) on or before the agreed upon date. We reserve the right to assess a late penalty of 10% of the appraisal fee if the report is not received by the due date and 1% per day thereafter, if a good cause was not provided during the course of the engagement. In the event that Home Savings does not receive the appraisal within 10 days of the agreed upon delivery date, assuming just cause has not been provided, Home Savings reserves the right to terminate the engagement without liability or obligation to the appraiser.

We understand the need of detailed and dynamic dialogue between the appraiser and the borrower and borrower's agents, however, we cannot permit the discussion of appraisal fees, due dates or appraisal conclusions with anyone but the undersigned or their designee. If we think that the proposed loan amount or advance rate is relevant to your engagement, we will provide that information, otherwise do not discuss this matter with the borrower or loan officer. Failure to abide by these instructions may result in the termination of the engagement.

| Contact: | Kris Warner<br>304-376-4672 |
|---|---|
| Contact Telephone: | See above |
| Comments: | None |
| Other: | None |

If you are unsuccessful in obtaining information that you deem necessary to proceed with this assignment, please call or email. You may also contact Gregory Vantell, SRA, at 330-758-6691 or email to greg@vantell.com.

The Home Savings and Loan Company requires proof of proper real estate appraisal licensure to perform the assigned task. **Please include a copy of your current real estate appraisal license or certification** in the addenda of the report for all appraisers signing the appraisal certification.

Please sign below indicating your acceptance of the terms of this letter and include this letter within the addenda of your completed report. **Fax your acceptance to 330-758-8582**, or email to greg@vantell.com.

Sincerely,

Vantell Associates, Inc.
Gregory Vantell, SRA
Appraisal Facilitator/Reviewer

I acknowledge and accept this assignment on my behalf and as the authorized representative of the company.

| Date: | *2/10/10* |
|---|---|
| Appraiser & Company: | *Samuel D. Koon & Associates, Ltd.* |
| By: | *Samuel D. Koon / Michele M. Reamer* |
| Title: | *President* |
| Print Name: | *Samuel D. Koon* |
| Signature: | *Samuel D. Koon* |

Special Instructions: In addition to providing a USPAP conforming appraisal, fulfillment of this contract requires that you address the following issues:

1. provide a detailed description with photographs of all sale comparables;

2. always provide a land value; provide plat maps, or an adequate description, of all land sale comparables;

3. avoid excessive and redundant boilerplate and emphasize reporting the results of recent conversations about the key risk factors in the valuation with identified market participants;

4. provide an overview of the supply and demand trends within the submarket that impacts your appraisal;

5. **complete the following review checklist;**

# REVIEW CHECKLIST

| Borrower: | |
|---|---|
| Address: | |
| Property Building Type: | Office → Land Value |
| Appraiser: | Thomas J. Katiker / M. Michele Renner |
| Effective Date of Appraisal: | March 8, 2010 |
| Market Value "As Is" | $2,450,000 |
| Market Value "As Proposed" (if applicable) | N/A |

The following information is required for conformance to USPAP and OCC regulations
(check box yes, and include page number, or no):

| YES | PAGE # | NO | |
|---|---|---|---|
| ✓ | Intro letter | | (a) The appraisal is addressed to the Bank or another Financial Services Institution |
| ✓ | I-10 | | (b) The appraiser possesses the experience or has disclosed in the report any steps to gain the necessary knowledge to competently appraise the specific property type. |
| ✓ | I-3 | | © The real estate is adequately identified. |
| ✓ | I-5 | | (d) The appraiser reported/analyzed the subject's current and historical sales. |
| ✓ | Intro letter | | (e) The purpose of the appraisal is stated. |
| ✓ | I-4 | | (f) The real property interests being appraised are identified. |
| ✓ | I-5 | | (g) The effective date of the appraisal and the date of the inspection are stated. |
| ✓ | I-1to3 | | (h) All special limiting conditions and assumptions are identified. |
| ✓ | I-6 | | (l) The scope of the appraisal is outlined. |
| ✓ | I-3to4 | | (j) The appropriate definition of Market Value is used. |
| ✓ | II-11 | | (k) The effects on market value due to any easements, restrictions, encumbrances, leases or items of a similar nature are discussed. |
| ✓ | III-1 to 6 | | (l) The highest and best use of the land "as if vacant" and "as improved" are analyzed and reported. |
| ✓ | I-8 to 9 | | (m) The appraiser employed a reasonable valuation method that addresses the three approaches to market value, and explained the elimination of any approach not used. |
| ✓ | IV-1 | | (n) The land value was supported by an appropriate appraisal method or technique. |

| Yes | PAGE # | NO | |
|-----|--------|-----|---|
| | | N/A ✓ | (o) In the cost approach, the conclusion is supported by reasonable and logical analyses. |
| | | NA ✓ | (p) In the sales comparison approach, the conclusion is supported by reasonable and logical analyses. |
| ✓ | III-4 l05 | | (q) In the income approach, the conclusion is supported by reasonable and logical analyses. |
| | | NA ✓ | (r) The appraiser reported and analyzed current market conditions and trends that may affect projected income or the absorption period to the extent they affect the value of the subject property. |
| ✓ | IV-1 | | (s) The reconcilation appears reasonable. |
| | | NA ✓ | (t) If personal property, fixtures, or intangible items are included in the appraisal, they are identified, separately valued and discussed relative to their impact on the market value estimate. |
| ✓ | IV-2 | | (u) The appraisal contains the required signed certification. |
| ✓ | IV-2 | | (v) The appraiser has no present or future personal interest in the property. |
| ✓ | I-7 | | (w) The appraiser has personally inspected the property. |
| ✓ | IV-2 | | (x) The appraisal was not based on a requested minimum valuation, a specific valuation, or the approval of the loan. |
| ✓ | Letter | | (y) The appraisal conforms to USPAP and Bank guidelines. |

No.: C303821WV

"EXHIBIT A"

ALL that certain tract and parcel of real estate, situate, lying and being in the Fourth Ward of the City of Morgantown, Monongalia County, West Virginia, which real estate is more particularly bounded and described as follows, to-wit:

FIRST TRACT:  BEGINNING at a 3/8 inch deformed rod that is located at the Northwestern junction right-of-way line of Alley "F" and the Southern right-of-way line of Ensign Avenue and the Northeastern corner of Lot No. 17 of Block No. 40; thence leaving said beginning point and with the Western right-of-way line of said Alley "F", South 52 degrees 49' 20" West a distance of 509.052 feet to a 3/8 inch deformed rod that is located in the Southern line Lot No. 28 of Block No. 40 in the Eastern right-of-way line of Beverly Avenue and being at the end of a curve to the left that has a radius of 55.95 feet; thence with said Eastern right-of-way line of said Beverly Avenue and said curve to the left in a Western direction an arc distance of 11.139 feet to the Southeastern corner of Lot No. 29 of Block No. 40; thence with the Eastern line of said Lot No. 29 of Block No. 40, North 23 degrees 30' West a distance of 206.86 feet to a point at the Northeastern corner of said Lot No. 29 of Block No. 40 and being in the southern right-of-way line of Ensign Avenue; thence with the Southern right-of-way line of said Ensign Avenue three calls, North 66 degrees 30' East a distance of 237.82 feet to a point in the Northern line of Lot No. 23 of said Block No. 40, North 75 degrees 00' East a distance of 224.50 feet to a 3/8 inch deformed rod and South 57 degrees 00' East a distance of 74.75 feet to the point and place of beginning, and being all of Lots No. 17 through 28 Block No. 40 of the revised lot plan of North Morgantown, a copy of which said map or plat is of record in the Office of the Clerk of the County Commission of Monongalia County, West Virginia, in Deed Book Volume No. 182, at Page 250, and as shown the first and second parcel upon a plat of a land survey that was performed by H&H Surveying dated September 15, 1997, of record in said Clerk's Office.

Map 15 - Parcels 232, 231 and 230.2

SECOND TRACT:  BEGINNING at a 3/8 inch deformed rod that is located at the Southwestern corner of Lot No. 10 of the Barbe Addition and the Southeastern corner of Lot No. 8 of Block No. 49 of the revised lot plan of North Morgantown being in the Northern right-of-way line of Ensign Avenue; thence leaving said beginning point and with the Northern right-of-way line of said Ensign Avenue North 57 degrees 00' West a distance of 125.41 feet to a point at the Southeastern corner of Lot No. 10 of said Block No. 49; thence with the Eastern line of said Lot No. 10 North 16 degrees 40' West a distance of 52.886 feet to a point that is located at the Northeastern corner of said Lot No. 10 of said Block No. 49 and being in the Southern right-of-way line of an unnamed 10 foot Alley; thence with the Southern right-of-way line of said unnamed 10 foot Alley North 89 degrees 15' East a distance of 84.404 feet to a railroad spike that is located at the Southeastern end of said unnamed 10 foot Alley and being in the Western line of Lot No. 11 of aforesaid Barbe Addition; thence with the Western line of said Lot No. 11 and aforesaid Lot No. 10 of aforesaid Barbe Addition South 16 degrees 40' East a distance of 125.338 feet to the point and place of beginning, and being all of Lots No. 8 and 9 of Block No. 49 of the revised lot plan of North Morgantown, a copy of which said map or plat is of record in the Office of the Clerk of the County Commission of Monongalia County, West Virginia, in Deed Book Volume No. 182, at Page No. 250, and as shown as the second parcel upon a plat of a land survey that was performed by H&H Surveying dated September 15, 1997.

Map 15 - Parcel 93.2

BEING the same real estate conveyed to Grand Central Building Limited Liability Company of Morgantown, a limited liability company, by Angel Grace, L.L.C., a limited liability company, by Deed dated October 1, 1997, of record in the Office of the Clerk of the

No.: C303821WV

County Commission of Monongalia County, West Virginia, in Deed Book No. 1153, at Page 176.

PART II:
ALL those certain lots, tracts or parcels of real estate, together with the buildings and improvements situate, lying and being in the Fourth Ward of the City of Morgantown, Monongalia County, West Virginia, and more particularly bounded and described as follows:

FIRST PARCEL: Beginning at a 3/8 inch deformed rod that is located at the Eastern right of way junction corner of Beverly Avenue, 40 feet wide and the Southern right of way line of Alley "F" 15 feet wide; thence leaving the Eastern right of way line of said Beverly Avenue and with the Southern right of way line of said Alley "F", two calls, North 52 degrees 49' 20" East, a distance of 330.72 feet to a 3/8 inch deformed rod and North 52 degrees 49' 20" East, a distance of 61.87 feet to a 3/8 inch deformed rod that is located in the Southern right of way line of said Alley "F" and being located at the Northwestern corner of a 2.211 acre tract of ground that Dormitory No. 2 known as Westchester Hall now occupies; thence with the outline of said 2.211 acre tract, three calls, South 27 degrees 52' 40" West, a distance of 176.78 feet to a tack in a lead plug that is located in an asphalt walkway, South 27 degrees 52' 40" West, a distance of 210.25 feet to a 3/8 inch deformed rod that is located in an asphalt roadway and South 46 degrees 38' 00" East, a distance of 20.00 feet to a 3/8 inch deformed rod that is located in the center line of the said annulled portion of Sixth Street, 50 feet wide; thence leaving said 2.211 acre tract and with the center line of the said annulled portion of Sixth Street, South 45 degrees 12' 00" West, a distance of 159.37 feet to a concrete nail that is located in the center line of said Sixth Street; thence North 6 degrees 08' 00" West, a distance of 32.03 feet to a 3/8 inch deformed rod that is located at the Northern right of way junction corner of Sixth Street with the Eastern right of way junction corner of Beverly Avenue 40 feet wide; thence with the Eastern right of way line of said Beverly Avenue, North 6 degrees 08' 00" West, a distance of 171.63 feet to a 3/8 inch deformed rod that is located at the beginning of a curve to the left that has a radius of 55.95 feet; thence with the arc of said curve to the left a distance of 31.07 feet to the point and place of beginning and containing 1.061 acres as shown upon a plat of a land survey that was performed by H & H Surveying & Associates, Inc. dated March 8, 1989, and revised March 27, 1989, a copy of which is recorded in the Office of the Clerk of the County Commission of Monongalia County, West Virginia.

Map 15 - Parcel 233

SECOND PARCEL: Beginning at a 3/8 inch deformed rod that is located at the Northern right of way junction corner of Sixth Street, 50 feet wide, with the Southern right of way junction corner of Ensign Avenue, 40 feet wide; thence leaving Ensign Avenue and with the Northern Right of way line of said Sixth Street, South 45 degrees 12' 00" West, a distance of 139.80 feet to a 3/8 inch deformed rod that is located at the Eastern end of the annulled portion of said Sixth Street; thence with the Eastern annulled end of said Sixth Street, South 44 degrees 48' 00" East, a distance of 50.00 feet to a point in the Southern right of way line of said Sixth Street and being located on the Northern corners of Lots No. 21 and 22 of Block No. 30; thence with the line of said Lots No. 21 and 22, South 44 degrees 48' 00" East, a distance of 62.40 feet to a 3/8 inch deformed rod and being located at the Southern corner of Lots No. 21 and 22 and being in the Northern right of way line of University Avenue originally Star City Road 30 feet wide; thence with the Northern right of way line of said University Avenue, two calls, South 48 degrees 12' 19" West, a distance of 80.11 feet to a 3/8 inch deformed rod and South 33 degrees 57' 18" West, a distance of 370.33 feet to a 3/8 inch deformed rod that is located at the Southern corners of Lots No. 10 and 11 of said Block No. 30; thence leaving said University Avenue right of way and with the line of said Lots No. 10 and 11, North 46 degrees 38' 00" West, a distance of 130.48 feet to a 3/8 inch deformed rod that is located at the Northern corners of said Lots No. 10 and 11 in the Southern right

of way line that annulled portion of aforesaid Sixth Street; thence North 44 degrees 48' 00" West, a distance of 25.00 feet to a 3/8 inch deformed rod that is located in the center line of that annulled portion of aforesaid Sixth Street and being the Southeastern corner of 1.061 acre tract of ground that Dormitory No. 1 known as Carlyle Hall now occupies; thence with the outline of said 1.061 acre tract three calls, North 46 degrees 38' 00" West, a distance of 20.00 feet to a 3/8 inch deformed rod that is located in an asphalt Roadway North 27 degrees 52' 40" East a distance of 210.25 feet to a tack in a lead plug that is located in an asphalt walkway and North 27 degrees 52' 40" East, a distance of 176.78 feet to a 3/8 inch deformed rod that is located in the Southern right of way line of Alley "F" 15 feet wide; thence with the Southern right of way line of said Alley "F", North 52 degrees 49' 20" East, a distance of 119.61 feet to a 3/8 inch deformed rod that is located in the Western right of way line of Ensign Avenue, at this point 30 feet wide and at the beginning of a curve to the left that has a radius of 77.78 feet; thence with the Western right of way line of said Ensign Avenue with said curve to the left an arc distance of 78.25 feet to a 3/8 inch deformed rod at the end of said curve to the left; thence continuing with the Southern right of way line of said Ensign Avenue, at this point 40 feet wide North 73 degrees 20' 00" East, a distance of 66.80 feet to the point and place of beginning, containing 2.211 acres as shown on a plat of a land survey that was performed by H & H Surveying & Associates, Inc., dated March 8, 1989, and revised March 27, 1989, a copy of which is recorded in the Office of the Clerk of the County Commission of Monongalia County, West Virginia.

Map 14 - Parcels 14.1 and 14

Together with those rights granted unto The Equitable Life Assurance Society of the United States, a New York Corporation, in and to that certain mutual easement and right of way granted and created by Agreement dated January 29, 1980, and recorded in the Office of the Clerk of the County Commission of Monongalia County, West Virginia, in Deed Book No. 836, at page 56.

And together with an easement for parking of fifty-five cars over the following premises (hereinafter referred to as "Parking Easement"):

All of Lot Nos. 7, 8, 9, 10 & 11 of Clyde D. Barbe Plan of Lots, as set forth more fully and at large on the map or plat of said Clyde D. Barbe Plan of Lots, prepared on May 15, 1926, and recorded in the aforesaid County Clerk's Office in Deed Book No. 348, at page 97A, and more particularly shown on a survey performed by H & H Surveying and Associates, Inc., dated as revised March 27, 1989, and described as follows:

Beginning at a 3/8 inch deformed rod that is located in Northern right of way line of Ensign Avenue, 40 feet wide and being located at the Southwestern corner of Lot No. 6 of the Clyde D. Barbe Plan of Lots; thence leaving said beginning point and with the Northern right of way line of said Ensign Avenue, South 73 degrees 20' 00" West, a distance of 163.92 feet to a 3/8 inch deformed rod that is located at the Southwestern corner of Lot No. 10 of aforesaid Clyde D. Barbe Plan of Lots; thence leaving said Ensign Avenue and with the Western line of said Lot No. 10, North 16 degrees 40' 00" West, a distance of 110.00 feet to a point at the Southwestern corner of Lot No. 11; thence with the Western line of said Lot No. 11, two calls, North 16 degrees 40' 00" West, a distance of 18.75 feet to a point and North 0 degrees 24' 02" West, a distance of 120.58 feet to a point that is located at the Northwestern corner of said Lot No. 11 and being in the Southern right of way line of Evans Street, 30 feet wide; thence with the Southern right of way line of said Evans Street, North 89 degrees 35' 58" East, a distance of 33.33 feet to a point at the Northwestern corner of Lot No. 12; thence leaving said Evans Street and with the Western line of said Lot No. 12, South 16 degrees 40' 00" East, a distance of 125.17 feet to a 3/8 inch deformed rod that is located at the Southwestern corner of said Lot No. 12 and being in the Northern line of Lot No. 9; thence with the Southern line of said Lot No. 12 and Lots No. 13 and 14, North 73 degrees 20' 00" East, a distance of 98.15 feet to a 3/8 inch deformed rod that is located at the Northwestern corner of aforesaid Lot No. 6; thence with the Western line

of aforesaid Lot No. 6, South 16 degrees 40' 00" East, a distance of 110.00 feet to the point and place of beginning, and being all of Lots No. 7, 8, 9, 10 and 11 of the Clyde D. Barbe Plan of Lots.

Map 14 - Parcel 12.1

Being the same real estate conveyed to Grand Central Building Limited Liability Company of Morgantown, a limited liability company, by Allen & O'Hara, Inc. a Tennessee corporation, by Deed dated October 7, 1994, of record in the Office of the Clerk of the County Commission of Monongalia County, West Virginia, in Deed Book No. 1096, page 329.

PART III:
Being a 15 foot right of way and running a distance of approximately 517 feet from Ensign Avenue to Beverly Avenue in the Fourth Ward of the City of Morgantown, Monongalia County, West Virginia and as laid down, designated and dedicated to public use as a street referred to as Alley F between Beverly Avenue and Ensign Avenue, as shown on a map or plat of record in the Office of the Clerk of the County Commission of Monongalia County, West Virginia, in Deed Book No. 1174, page 362.

Map 15 - Parcel 273

Being the same real estate entered into Agreement by and between Grand Central Building Limited Liability Company of Morgantown, a limited liability company, and The City of Morgantown, dated November 5, 1998, of record in the Office of the Clerk of the County Commission of Monongalia County, West Virginia, in Deed Book No. 1174, page 358, pursuant to an Ordinance Vacating, Abandoning, and Annulling said 15 foot right of way known as "Alley F", of record in said Clerk's office in Deed Book No. 1174, page 355.

Case 1:10-bk-00638    Doc 88    Filed 08/03/10    Entered 08/03/10 18:11:12    Desc Main
Document    Page 70 of 70

| Copy sent | UNIT | TENANT | STATUS | START | END |
|---|---|---|---|---|---|
| X | 3021 | Able Body Workshop | Under Lease | 6/29/2009 | 6/28/2010 |
| X | 3018 | Access Medical | Under Lease | 2/15/2010 | 2/14/2011 |
| X | 4025-4027 | Adult Education - ESL | Under Lease | 1/1/2010 | 12/31/2010 |
| X | 6022 | All about Hair | Under Lease | 1/1/2010 | 12/31/2010 |
| X | 4018 | Appalachian Pest Control | Month to Month | 9/1/2006 | 8/31/2007 |
| X | 1040 | Bernard Parsons | Under Lease | 1/27/2010 | 1/26/2011 |
| X | 1006-1008-1010 | Blue & Gold News | Under Lease | 10/1/2009 | 9/30/2010 |
| X | 3000 | Carl Seigfried | Under Lease | 5/6/2009 | 5/5/2010 |
| X | 7023 | Contemporary Services Corp. | Under Lease | 9/1/2006 | 8/31/2010 |
| X | 3029-3031 | Creative Intervention | Month to Month | MTM | MTM |
| X | 1038 | Dusty Hays | Under Lease | 5/6/2009 | 5/5/2010 |
| X | 2001 | Ed Kohout | Under Lease | 1/19/2010 | 1/18/2011 |
| X | 9003-9005-9007-9008-9010 | Greater Love Family Outreach Ministries | Month to Month | MTM | MTM |
| X | 400084003 | IEHC | Under Lease | 10/1/2009 | 10/30/2010 |
| X | 3008 | James Frost | Under Lease | 12/2/2008 | 11/30/2010 |
| X | 3011 | JK Harris & Company, LLC | Month to Month | MTM | MTM |
| X | 4010 | Joshua Chicerelli | Under Lease | 6/1/2009 | 5/30/2010 |
| X | 3025 | Kathleen and Peter Kahn | Under Lease | 10/1/2009 | 9/30/2010 |
| X | 5000 | Keylogic Systems | Under Lease | 12/31/2008 | 6/30/2010 |
| X | 4011 | Lauttamus Communications | Month to Month | MTM | MTM |
| X | 6023-6024 | Mac Warner | Under Lease | 1/1/2010 | 6/30/2010 |
| X | 3016 | Maid for Today (Judy Rose) | Renewing | 9/1/2007 | 8/31/2008 |
| X | 2001 | Mountaineer Jeffersonian | Renewing | 12/1/2008 | 11/30/2009 |
| X | 8086 | Pat Fowler | Under Lease | 7/1/2009 | 6/30/2010 |
| X | 3013 | Patricia Sasso | Under Lease | 10/1/2009 | 9/30/2010 |
| X | 1003 | Patrick Wikle | Under Lease | 2/8/2010 | 2/7/2011 |
| X | 6000 | SPOKES (Board of Education) | Under Lease | 8/1/2008 | 7/31/2010 |
| X | 4007-4009 | Stonebridge Baptist Church | Under Lease | 8/18/2009 | 7/31/2010 |
| X | 6001 | Sun Shack (Ralph Powell) | Under Lease | 12/1/2009 | 11/20/2010 |
| X | 3038 | Tom Milstead (Equitable Gas) | Under Lease | 12/31/2009 | 12/31/2010 |
| X | 3030-3032 | Turbo Media Group | Under Lease | 12/1/2009 | 11/30/2010 |
| X | 4020-4022-4024 | USW Local 5-957 | Under Lease | 10/1/2009 | 9/30/2010 |
| X | 2002 | Vector -Ben Snowden | Renewing | 5/1/2007 | 2/28/2010 |
| X | 8087-8089 | Winans Services | Under Lease | 10/12/2009 | 9/11/2010 |